**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**TERESA ROBERTS**                                                          **PLAINTIFF**

**vs.**                                                          **CASE NO.: 1:07cv304-M-D**

**THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY**                                                          **DEFENDANT**

---

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

## I. <u>Introduction</u>

Plaintiff Teresa Roberts seeks judicial review of her claim for long-term disability benefits under an ERISA-governed plan. As the Court is aware, ERISA claims decisions are judicially reviewed under an abuse-of-discretion standard, based on the administrative record. Defendant, The Lincoln National Life Insurance Company ("Lincoln"), thoroughly evaluated Plaintiff's claim. Lincoln correctly determined that Plaintiff's neck pain, depression, and other symptoms did not render Plaintiff "totally disabled" under the terms of the insurance policy/ ERISA plan.

The ERISA benefit plan granted discretionary authority to Lincoln to interpret the insurance policy provisions, to administer claims, and to make "conclusive and binding" claims decisions. Under controlling ERISA law, Plaintiff has the burden of proving that Lincoln abused its discretion in analyzing Plaintiff's claim. Lincoln's decision was correct, and certainly was not an abuse of discretion.

## II.  Controlling Authorities and Standard of Review

### A.  ERISA Governs This Case and Is Preemptive

As Plaintiff's complaint (¶ 1) recognizes, this case is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*  Lincoln issued Group Long Term Disability Insurance Policy No. 000010032418 (the "Policy") to Blood Systems, Inc. The Policy (which is located in the administrative record that was reviewed by Lincoln[1] personnel, see A.R. 29-64)[2]  was clearly part of an ERISA plan.  The Policy provides long-term disability insurance to designated employees of Blood Systems, Inc., and was purchased by that employer to provide disability insurance as a benefit for its employees.  Insured employees were not required to contribute to the cost of the insurance.  (A.R. 33)  The Policy specifically references ERISA claims procedures, including exhaustion of administrative remedies.  (A.R. 44)  Plaintiff's complaint expressly asserts claims arising under ERISA; it is undisputed that the claim at issue arises under an ERISA-governed plan.

ERISA supersedes and preempts any and all state laws insofar as they relate to any employer benefit plan. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987); see also *Haynes v. Prudential Health Care*, 313 F.3d 330 (5th Cir. 2002)(explaining ERISA preemption).  It is beyond any dispute

---

[1]  The Policy was originally issued by Jefferson Pilot Financial Insurance Company, which was merged into Lincoln effective July 2, 2007.  The claim was administered by Jefferson Pilot. Lincoln has acknowledged that it is responsible for the claims decision, and that Lincoln is the insurer that funds the benefit plan at issue.  See, e.g., Lincoln's Answer, Court file Document 7, and Agreed Order dismissing employer as defendant, Court file Document 15.  Numerous documents in the Administrative Record were generated by Jefferson Pilot Financial Insurance Company, on Jefferson Pilot stationery, before the effective date of the merger.

[2]  We cite the Administrative Record considered by Lincoln in making its claim decision as "A.R. [page #]."  The entire Administrative Record has been filed as Exhibit 1 to Lincoln's Summary Judgment Motion.  Due to the personal and confidential information contained throughout the Administrative Record, Lincoln has filed the Record conventionally, rather than electronically, and has requested that the Administrative Record be maintained under seal.

that ERISA therefore governs this case.[3]  Plaintiff's sole remedies are provided by ERISA; her

demand for punitive damages is therefore preempted.

### B.  Under ERISA, Lincoln's Decision Is Reviewed Only For Abuse Of Discretion

Lawsuits over ERISA plan benefits are governed by specialized procedures and rules.  Courts

review claims decisions with deference, and may not overturn those decisions absent an abuse of

discretion.

### 1.  This Court Has Previously Described ERISA Claims Rules

This Court, by Judge Mills, has recently summarized the prescribed ERISA judicial

"standard of review" as follows:

> ERISA "permits a person denied benefits under an employee
> benefit plan to challenge that denial in federal court." *Metropolitan
> Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299
> (citing 29 U.S.C. § 1001 et seq.). In deciding these cases, the
> Supreme Court has laid out four principles of review. *Id*. at 2347.
> First "a court should be 'guided by principles of trust law' . . . and it
> should consider a benefit determination to be a fiduciary act." *Id.
> (*quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-
> 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). Secondly, "[p]rinciples
> of trust law require courts to review a denial of plan benefits 'under
> a de novo standard' unless the plan provides to the contrary." *Id*. at
> 2348 (quoting *Firestone*, 489 U.S. at 115). Third, "[w]here the plan
> provides to the contrary by granting 'the administrator or fiduciary

---

[3]In order for ERISA to govern a claim, two criteria must be met: (1) an employee benefit plan must exist, and (2)  Plaintiff must have standing to sue as a participant or beneficiary of that employee benefit plan.  *Vega v. National Life Ins. Services, Inc*., 188 F.3d 287, 291 (5th Cir. 1999) (*en banc*).  "Employee benefit plans" covered by ERISA may be either "employee welfare benefit plans" or "employee pension benefit plans."  *Cooley v. Protective Life Ins. Co.*, 815 F.Supp. 189, 191 (S.D. Miss. 1993).  ERISA, 29 U.S.C. § 1002(1) defines an "employee welfare benefit plan" or "welfare plan" as any program established or maintained by an employer for the purpose of providing for its participants or their beneficiaries, "through the purchase of insurance or otherwise," medical care or benefits, or "benefits in the event of sickness, accident, disability, death,' etc.  The administrative record demonstrates that the insurance policy herein was issued to  Plaintiff's employer for the purpose of providing benefits to employees participants.  (See, e.g., A.R. 30; complaint ¶ 2)

3

discretionary authority to determine eligibility for benefits' . . . '[t]rust principles make a deferential standard of review appropriate.'" *Id.* (quoting *Firestone*, 489 U.S. at 115, 111). Finally, [i]f 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id. (*quoting *Firestone*, 489 U.S. at 115).

Here the plan gives plan fiduciaries "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits." When plans give discretion to fiduciaries, the Fifth Circuit uses a two-step anaysis to determine whether the fiduciary abused its discretion. *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 540 (5th Cir. 2007). First a court must determine whether the interpretation is "legally correct." *Id*. If so, there is no abuse of discretion and the inquiry ends. *Id*. However, if the interpretation is not legally correct, a court must consider whether the fiduciary's interpretation constitutes an abuse of discretion. *Id.*; *see also High v. E-Systems Inc*., 459 F.3d 573, 577 n.2 (5th Cir. 2006).

*Price v. Metropolitan Life Ins. Co.*, No. 2:04cv338, 2008 U.S. Dist. LEXIS 68063, *3-5 (N.D. Miss. Sept. 8, 2008). Likewise, this Court has written:

In this context, the abuse of discretion standard is satisfied when there is "concrete evidence" to support the plan administrator's decision or there is a "rational connection" between the evidence in the record and the final decision. *Vega v. National Life Ins. Co.*, 188 F.3d 287 (5th Cir. 1999)(*en banc*); *Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999). De novo review applies only to the plan administrator's construction of the meaning of the plan terms or the benefit entitlement provisions, and even then, only where the plan administrator lacks discretionary authority in those areas. *Vercher*, 379 F.3d at 226.

Furthermore, in reviewing the plan administrator's decision, the Court may not consider evidence outside the administrative record. *Vega*, 188 F.3d at 300. Also, the administrative record cannot be supplemented after suit is filed. *Id*. Finally, the Court may not consider whether the Social Security Administration considers the claimant to be disabled, as the Administration is governed by different rules. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33, 123 S.Ct. 1965, 1970-71, 155 L.Ed.2d 1034 (2003). Plan administrators are not required to accord special deference to the

> opinions of treating physicians. *Black & Decker*, 538 U.S. 822, 831,
> 1123 S.Ct. 1965, 1970.

*LaValley v. UnumProvident Corporation*, 2006 U.S. Dist. LEXIS 47131, *3-5 (N.D. Miss. July 12, 2006) (granting summary judgment for ERISA plan insurer on disability claims); *see also Kilgore v. Peoples Bank and Trust Co.*, 2006 U.S. Dist. LEXIS 47123, *2-4 (July 12, 2006) (applying same ERISA standards, granting summary judgment for Plan Administrator on disability claims). This Court's decisions precisely track the controlling Fifth Circuit precedents.

## 2. <u>Seminal Fifth Circuit Authorities Regarding Judicial Review of ERISA Claims</u>

According to the Fifth Circuit, facts about Plaintiff's condition and ability to work are "historical facts." Those "historical facts" are reviewed under an abuse of discretion standard, based on the administrative record. The *Pierre*, *Southern Farm v. Moore*, and *Wildbur* cases crystallized Fifth Circuit law on this issue in the early 1990's:

> This Circuit addressed the issue of the appropriate standard of review to apply to a plan administrator's factual determination in *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir.1991). Based on facts similar to those in the present case, the court in *Pierre* held that it should review a factual determination made by a plan administrator for an abuse of discretion. In reaching that decision, the court noted that, according to trust principles, an ERISA fiduciary possesses inherent discretion through a statutory grant of authority to control and manage the operation of the plan. The Court then noted the difficulty and uncertainty in applying de novo review on a "cold record" and reasoned that in "virtually all decisional review, some deference is given to the fact finder, whether it is a district court giving deference to an administrative body or an appellate court giving deference to the district court." **Accordingly, the Court in *Pierre* ruled that for practical reasons courts simply cannot supplant plan administrators, through de novo review, as resolvers of mundane and routine fact disputes. Ultimately, we held that "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard; that is, federal courts owe due deference to an**

> **administrator's factual conclusions that reflect a reasonable and impartial judgment."**

*Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100-01 (5th Cir. 1993) (emphasis added).

> This is not to say that a litigant dissatisfied with an administrator's benefit determination is free to disregard the evidence before the administrator and relitigate in court the **historical facts** surrounding a claim.  **We have long held that in conducting review under an abuse of discretion standard, a district court should evaluate the administrator's fact findings regarding the eligibility of a claimant based on the evidence before the administrator**, assuming that both parties were given an opportunity to present facts to the administrator.  *See  Denton v. First National Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir.1985);  *Lowry v. Bankers Life & Casualty Retirement Plan*, 865 F.2d 692, 694 (5th Cir.), *reh'g denied*, 871 F.2d 522, *cert. denied*, 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989).  Yet, in these and other opinions, we have also explained how other evidence, not dealing with the historical facts underlying the benefit determination, and therefore usually not in the administrative record, was relevant under our abuse of discretion analysis.

*Wildbur v. ARCO Chemical Co.* 974 F.2d 631, 639 (5th Cir. 1992) (emphasis added).

### 3.  <u>Recent, On-Point Fifth Circuit Authorities Regarding Disability Claims</u>

Extensive recent Fifth Circuit case law reinforces these rules.  For example, in *Wade v. Hewlett-Packard Dev. Co. Short Term Disability Plan*, 493 F.3d 533 (5th Cir. 2007), plaintiff sought disability benefits due to "major depression and attention deficit-hyperactivity disorder," accompanied by numerous symptoms.  The Plan denied the claim, "because the documentation did not substantiate a claim for short-term disability."  *Id*. at 537.  In affirming summary judgment for the Plan, the Fifth Circuit noted that "disability is more factual than interpretive," *id.* at 540; that "to avoid reversal in the summary judgment context, the Administrator's decision must be supported by

substantial evidence in the administrative record, which is evidence that a reasonable mind might accept as sufficient to support a conclusion;" and that "substantial evidence" is defined as "more than a scintilla, less than a preponderance . . ." *Id*. at 541 (emphasis added).  Based on these rules the Fifth Circuit affirmed the summary judgment/ denial of benefits, and also affirmed the award of costs against plaintiff.  *Id*. at 543.

The Fifth Circuit's decision in *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389 (5th Cir. 2007), is particularly instructive in the present case.   Plaintiff, who was employed by Dell Computer Corp. as a "Sales Manager IV," sought long-term disability benefits under her employer's ERISA plan.   Plaintiff was granted Social Security disability benefits, and received 36 months of benefits from her employer's plan.  Her benefits were then terminated, because the insurer concluded she was not disabled under the "any occupation" provisions of the policy.  *Id*. at 391-93.

The district court overruled the insurer's decision, granting summary judgment in favor of the plaintiff.  The insurer appealed.  "The primary focus of the appeal [was] the district court's holding that Liberty's decision to terminate benefits was arbitrary and capricious because it discounted and ignored Corry's subjective claims of pain and disability." *Id*. at 391.  Ms. Corry, like Plaintiff Roberts in the present case (as explained below), had a sedentary job and a host of complaints.  As the Fifth Circuit stated:

> A complete diagnosis of the cause of Corry's disability has never been clear. The parties agree that Corry suffers from a seizure disorder, fibromyalgia, and a rotator cuff sprain in her shoulder. The parties disagree, however, as to whether her pain could also be attributed to Chronic Fatigue Syndrome, lupus, Sjogren's Syndrome, undifferentiated or mixed connective tissue disease, or some other rheumatic or musculoskeletal disorder.

*Id*. at 391-92 (Footnotes omitted).  Numerous physicians documented Ms. Corry's self-reported complaints of pain and inability to function.

7

> For example, according to Corry, she was unable to do her grocery shopping or to go out for more than one and a half hours. Corry also reported that she needed assistance with her shower and much of her daily care. She found it difficult to comb her hair, open doors, cut meat, climb a flight of stairs, and turn a lock. Apparently she was unable to lift a full coffee pot. She was able to do some paperwork in the mornings, when she was at maximum mental sharpness.

*Id*. at 394. One of Ms. Corry's physicians indicated she was "incapable of resuming full-time employment in a sedentary duty capacity," due to her "rheumatic profile." *Id*. at 394. Another physician opined that Ms. Corry "remains on disability and I feel that given her current condition, she would be unable to return to any type of gainful employment." *Id.* at 395-96. Those two physicians submitted affidavits, concluding that Ms. Corry "was disabled and unable to perform sedentary work in a work environment." *Id*. at 396-97.

The insurer retained consulting physicians to review and evaluate Ms. Corry's medical records. One concluded that "claimant's reported disability is not substantiated by the objective medical documentation . . . Based on the objective medical documentation related to the claimant's non-psychiatric conditions, I find no basis to preclude this claimant from performing sedentary work." *Id* at 395. Another consulting physician retained by the insurer concluded that while Ms. Corry indeed had fibromyalgia and shoulder impingement, she remained physically able to perform duties of full-time sedentary employment. *Id*. at 396.

The insurer decided that Ms. Corry was not disabled under the terms of the policy, and denied her claim. Corry sued, and the district court granted her motion for summary judgment, "holding that Liberty's decision to terminate Corry's benefits was an abuse of discretion for failure to consider Corry's subjective complaints of pain and disability." *Id* at 397. The Fifth Circuit reversed and rendered the decision, holding that the insurer's decision was adequately supported by the administrative record.

8

First, the Fifth Circuit noted that (as in this case) the insurer had discretionary authority to determine eligibility for benefits and to interpret the plan. The Court reiterated the rules for judicial review of a discretionary ERISA claim decision:

> Under the abuse of discretion standard, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir.2004) "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted). "An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir.1996).
>
> Where, as here, the administrator is self interested because it both insures and administers the plan, we apply a "sliding scale standard" and accord Liberty's decision less than full deference. *Vega*, 188 F.3d at 295-97. "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id*. at 297. Here, although Liberty's dual role as administrator and insurer provides a minimal basis for a potential conflict of interest, *see Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir.2002), Corry presented no further evidence with respect to the degree that the conflict exists and affects Liberty's decision in this case. Accordingly, we review Liberty's decision "with only a modicum less deference than we otherwise would." *See Vega*, 188 F.3d at 301; *see also Lain*, 279 F.3d at 343. . . . Ultimately, "our review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness--even if on the low end." *Vega*, 188 F.3d at 297.

*Corry*, 499 F. 3d at 397-98. Applying these standards, the Fifth Circuit addressed Ms. Corry's arguments, and the trial court's analysis.

The district court had concluded that the insurer "discounted Corry's subjective reporting of disabling pain and fatigue" and "cherry-picked those conclusions that were grounded in objective medical criteria and completely ignored the significance of the subjective manifestations of Corry's

illness." *Id* at 398. The district court had also disapproved the insurer's focus on opinions of its

consulting physicians rather than Corry's treating physicians, who had "repeatedly asserted in letters

and affidavits that Corry is unable to return to work." *Id.* at 398-99. The Fifth Circuit noted,

however, that Corry's subjective complaints had indeed been considered by the insurer, and even

referenced in the letter denying the claim. *Id.* at 399-400. As the Fifth Circuit stated:

> The district court concluded, and Corry argues, however, that Corry's
> subjective complaints are entitled to more weight than the
> administrator gave them. But the job of weighing valid, conflicting
> professional medical opinions is not the job of the courts; that job has
> been given to the administrators of ERISA plans. *See Gothard v.
> Metropolitan Life Ins. Co.*, 491 F.3d 246, 249-50 (5th Cir.2007)
> ("[P]lan fiduciaries are allowed to adopt one of two competing
> medical views, a rule which resolves this appeal in favor of [the
> administrator].... [The administrator's] decision may not be correct,
> but we cannot say that it was arbitrary."). We only review for abuse
> of this discretion that has been given to the administrator. *Vega*, 188
> F.3d at 295. . . . **In this "battle of the experts" the administrator
> is vested with discretion to choose one side over the other**. *See
> Gothard*, 491 F.3d at 249-50. In sum, the claim that the administrator
> was arbitrary and capricious in failing to consider and give proper
> weight to relevant evidence must be rejected.

*Corry*, 499 F.3d at 401 (emphasis added). The Fifth Circuit noted that the insurer's consulting

physicians' opinions were adequate "substantial evidence," even if Corry's evidence would also be

sufficient to support her claim:

> We might well assume, as the district court essentially did, that the
> totality of Corry's subjective complaints could suffice to establish
> substantial evidence of disability; nevertheless, "[t]he law requires
> only that substantial evidence support a plan fiduciary's decisions,
> including those to deny or to terminate benefits, not that substantial
> evidence (or, for that matter, even a preponderance) exists to support
> the employee's claim of disability." . . . **Only recently have we once
> again emphasized that an administrator does not abuse its
> discretion by relying on the medical opinions of its consulting
> physicians instead of the medical opinions of a claimant's treating
> physicians**.

10

*Id*. at 402 (emphasis added). Thus, the Fifth Circuit held that the trial court had failed to apply the abuse-of-discretion standard, and reversed, rendering judgment for the insurer. *Id*. at 403.

The *Corry* decision demonstrates beyond dispute that Lincoln is entitled to summary judgment in this case. As in *Corry*, Plaintiff has numerous <u>subjective</u> complaints of pain, and self-evaluations of inability to work, some of which were repeated by her treating physician. Lincoln carefully and deliberately considered all available evidence. The <u>objective</u> findings of numerous physicians, and the clear conclusions of Lincoln's consulting experts, outweighed Plaintiff's subjective complaints and far exceeded the "substantial evidence" standard. Plaintiff wants this Court to substitute Plaintiff's judgment for Lincoln's, or to re-evaluate the evidence *de novo*, which of course would be identical to the erroneous approach that was reversed in *Corry*.

### III. Lincoln Has Full Discretionary Authority to <br> <u>Interpret the Policy and to Decide Claims</u>

As the Supreme Court held in *Firestone v. Bruch*, *supra,* ERISA plan documents may confer a high level of discretion upon ERISA plan administrators or their delegates to interpret plan provisions and resolve claims. In this case, Lincoln (the "Company," A.R. 35) has extensive discretionary authority:

> **COMPANY'S DISCRETIONARY AUTHORITY.** Except for the functions that this Policy clearly reserves to the Policyholder or Employer, the Company has the authority to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it. The Company's authority includes (but is not limited to) the right to:
>
> 1. establish administrative procedures, determine eligibility and resolve claims questions;
> 2. Determine what information the Company reasonably requires to make such decisions; and
> 3. Resolve all matters when an internal claim review is requested.

11

Any decision the Company makes in the exercise of its authority shall be conclusive and binding; subject to the Insured Employee's rights to request a state insurance department review or to bring legal action.
This provision does not apply to residents of California.

(A.R. 45)

Lincoln's discretion is broad, and extends to management of the Policy, interpretation of Policy provisions, administration of claims, and the right to "determine eligibility and resolve claims questions." Lincoln's discretionary decisions are "conclusive and binding."

### IV. Pertinent Terms of the Policy's Long-Term Disability Coverage

1. Definition of "Total Disability:" The Policy "provides long-term disability benefits" to eligible employees. (See A.R. 34, "Schedule of Benefits.") Lincoln agreed to pay a Total Disability Monthly Benefit to employees who met the definition of "Totally Disabled." (A.R. 52) Disability payments would not begin until a 90-day "Elimination Period" passed. (A.R. 34) Then, for 24 months an employee would be considered "Totally Disabled" if she could not perform her "Own Occupation." After 24 months of eligibility for benefits, an employee would be "Totally Disabled" only if she could not perform "Any Gainful Occupation:"

> **"Total Disability" or "Totally Disabled"** will be defined as follows:
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of Any Gainful Occupation.
> The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

(Policy, Definitions section, A.R. 52)

2. Limits On Disability Benefits For Certain Conditions: The Policy's "Specified Injuries

12

or Sicknesses Limitation" limited certain disability claims to 24 months.  The 24-month restriction applies to "Any Chronic Fatigue Sickness, Environmental Sickness, Mental Sickness, Musculoskeletal/ Connective Tissue Injury or Sickness, or Substance Abuse" as defined in the Policy.  (A.R. 58-59)  One of the conditions subject to the 24-month limitation is "Fibromyalgia," a major complaint and frequent diagnosis of Plaintiff.  Likewise, disability arising from "Mental Sickness" is subject to the 24-month limitation.  "Mental Sickness" is broadly defined, and expressly includes "depressive" disorders and "psychological"dysfunction.  (A.R. 58).  Again, Plaintiff's records contain frequent assessments of such disorders, especially after her benefit claim was initially denied.

   3.   <u>"Own Occupation" and "Any Gainful Occupation" Periods</u>:  As stated in the "Total Disability" definition, there are three time periods to be considered in any claim: 1) the 90-day "Elimination Period;" 2) the 24-month "Own Occupation Period," during which benefits are payable if the employee is "unable to perform each of the main duties of his or her regular occupation" (A.R. 34); and 3) the "Any Gainful Occupation" period thereafter.  "Gainful Occupation" is defined as "any occupation in which the Insured Employee is our could reasonable become qualified, considering his or her education, training, expertise, mental and physical abilities," along with available employment opportunities and ability to earn 60% of the employee's prior income.  Since Lincoln determined Plaintiff was not disabled from the outset, the later "Any Gainful Occupation" period was never reached.[4]

   4.   <u>Termination of Coverage</u>:  Under the policy's terms, an Insured Employee's coverage

_____

   [4] Plaintiff's complaint seeks "specific performance" including an order for payment of "future disability and insurance benefit payments."  Obviously any claim for "future" payments cannot be determined at present; only the period that Lincoln considered and determined is at issue here.  Claims for any later alleged disability periods would be unripe, and would involve analysis of the "Any Gainful Occupation" and "Specified Illness" provisions of the policy.

terminates "the date the Insured Employee's employment with the Employer terminates; unless coverage is continued as provided below." (A.R. 48) Coverage is continued if the employment is terminated during a covered Disability, or during approved medical leave until the employee notifies the employer she will not return to work. (A.R. 48-49) According to Plaintiff, her last day of work was September 22, 2005. (A.R. 262) Her employer indicated that Plaintiff began a medical leave on September 23, 2005, and worked part time from December 5 until December 13, 2005, and exhausted her medical leave on December 28 after which she was "no longer eligible for benefits." (A.R. 397) Therefore, if Plaintiff was not disabled on December 28, 2005, her eligibility terminated, and no after-occurring disability would entitle her to benefits. This aspect of Plaintiff's claim significantly reinforces the propriety of Lincoln's claim decision, since Plaintiff's medical complaints increased during 2006. Unless Plaintiff was continuously disabled from December 28, 2005 forward, her condition in 2006 is irrelevant.

### V. Pertinent Evidence In The Administrative Record Supports Lincoln's Determination That Plaintiff Was Not Disabled

Exhibit 1 to Lincoln's Motion for Summary Judgment is the entire Administrative Record considered by Lincoln in deciding Plaintiff's claim. That record demonstrates that Lincoln did its job properly. Extensive medical and occupational evidence was collected and evaluated; policy provisions were studied and applied; communications with Plaintiff and health care providers were detailed and documented. When the proper standard of review is applied, it is clear that the Administrative Record supports the decision of Plaintiff's claim.

### A. Plaintiff Was Employed In A Sedentary Job

Beginning in February 1999, Plaintiff was employed by Blood Systems, Inc. From December 2004 until she stopped working September 22, 2005, Plaintiff's position was "H.R. [Human Resources] Generalist." (A.R. 272) This was a sedentary desk job. According to her employer, Plaintiff's job did not require her to climb stairs or ladders, push, pull, lift, or carry anything. She was required to "occasionally" stand, walk, stoop, kneel, crouch, or reach overhead. (A.R. 274) Her job could be performed "by alternating sitting and standing," and did not require her to operate any type of foot controls. The only specific task identified by Plaintiff's employer that required her to use her hands was "data entry / clerical work." (A.R. 275) Lincoln determined that Plaintiff's standardized work title, as identified by the Dictionary of Occupational Titles, was "Personnel Clerk," a "sedentary" occupation per the company's occupational analysis. (See A.R. 441-442; A.R. 403; A.R. 194)

Properly applying the Policy's terms to the facts, Plaintiff would therefore not be disabled from her "Own Occupation" unless she could not perform each of the duties of her sedentary job - - that is, a job that involved typing on a computer, and could be performed while alternately sitting and standing.

### B. Description of Plaintiff's Medical Condition and Alleged Disability

Space does not permit us to itemize completely Plaintiff's medical records and complaints. The Administrative Record contains a catalogue of Lincoln's close review of those records. (See A.R. 1-28) In brief summary, Plaintiff's medical history reflects a number of varied and shifting self-reported maladies. Nine months before her alleged disability, Plaintiff visited an emergency room complaining of shortness of breath. Her medical history listed "gastroesophageal reflux

15

disease," hypertension, and "fibromyalgia." At that time, she was taking eight prescription medicines. (A.R. 385; see also A.R. 199, history of fibromyalgia; A.R. 208, history of fibromyalgia; A.R. 292, history of hypertension, hypercholestoral, sleep apnea, fibromyalgia, internal shingles, hysterectomy, epigastric reflux, sinusitis / allergies, listing ten medications taken by Plaintiff.)

Plaintiff claimed that her disability began on September 20, 2005, when she slipped on steps at her sister's house and tried to brace herself on the railing. (A.R. 292) Two days later she sought medical attention, complaining of pain in her lower back, buttock and hip joint [trochanteric] and SI [sacroiliac] joint. (A.R. 292) Plaintiff's physician, Dr. Crump, concluded that she had injured her sciatic nerve, was experiencing pain to the SI joint, had exacerbated arthritis in her in her lumbar spine (referencing an MRI performed in 2004), and had exacerbated her fibromyalgia. (A.R. 292-93)

Ms. Roberts stopped working and began a medical leave. She did not return to work until December 5, 2005. From December 5 until December 13 she worked four hours per day. She did not return to work after December 13, 2005. (A.R. 397) It appears that Plaintiff's employer provided her with insurance forms in mid-December, 2005. (See A.R. 444, fax legend.) She filed her claim, which Lincoln began reviewing by January 10, 2006. (A.R. 405)

From October 2005 through October 2006, Plaintiff saw numerous health care providers. While some of her symptoms and diagnosis changed, the pattern was consistent. As in the *Corry* case discussed *supra*, Plaintiff's physicians' records contain relatively moderate objective findings of injury or illness, accompanied by disproportionately severe self-reported pain and by increasing emotional complaints.

After her September 20, 2005, fall, Plaintiff began complaining about lower back pain. For at least two months, she continued complaining of lower back, hip and thigh pain. (See e.g., A.R. 341, October 19, 2005 report by Kenneth A. Grinspun, M.D.) Dr. Grinspun's records reflected

16

Plaintiff's subjective complaints, but stated the following objective observations:

> **10/19/2005** . . . PE shows normal hip exam. There is no pain with any internal or external rotation of the hip. She has normal neurologic exam. Strength on both legs is good. There are no paresthesias in her feet. She is tender to palpation in the region of the SI joints. X-rays of her pelvis show normal hips. Not evidence of fx.

A detailed 7-page medical report by neurosurgeon Richard Bobo, M.D., described Plaintiff's complaints and diagnosis as of November, 2005. That report (A.R. 342-348) reflects that Plaintiff's "chief complaint" was "back, left buttock, and bilateral leg pain" during her initial office visit on November 15, 2005. Dr. Bobo also noted that Plaintiff had "problems with depression," and "stress and depression from her pain." (A.R. 344) Despite the level of Plaintiff's complaints, on physical exam she was described "in <u>slight</u> distress from her pain." (A.R. 345, emphasis added.) Although Plaintiff demonstrated "good strength" for toe and heel walking, Dr. Bobo observed a "significant <u>affective</u> display of pain." (A.R. 345, emphasis added.) The examination of her head and neck reflected a "normal cervical alignment" and indicated her neck was "supple with no pain..." (A.R. 345) Her arms and legs were observed to have good alignment, with no atrophy, fasciculation, or masses. (A.R. 346) Her neurologic sensory examination reveals "intact sensation throughout extremities." (A.R. 347) Dr. Bobo reviewed an MRI report of October 5, 2005, which "shows a bulge at L-4 / L-5 [lumbar disk 4-5] without neural compression." (A.R. 347) Dr. Bobo concluded that the Plaintiff had "musculoskeletal back and leg pain without radiculopathy which will heal with time, back surgery would only make it worse. She also has a sciatic nerve injury from the pyraformis muscle." He prescribed oral medicines and directed Plaintiff to walk with a cane. (A.R 347)

This distinction between Dr. Bobo's objective findings and Plaintiff's self-reported, subjective complaints persists throughout Plaintiff's medical records. For example, in Plaintiff's

September 22, 2005 visit to her physician, two days after her accident, Plaintiff "burst out in loud screams" and was "complaining of excruciating pain to lower back," but her physician concluded "it is evident that Mrs. Roberts is in moderate distress secondary to pain."  (A.R. 292)[5]

Indeed, findings through objective diagnostic tests on Plaintiff were consistently "mild" or "moderate" or otherwise differed from doctors' observations.  See, for example:

• An MRI report October 5, 2005 showed "Some very mild" lumbar disk bulging; "moderate generalized" disk bulging; "some very minor" bulging; "some very mild canal as well as very mild left foraminal compromise," etc.  (A.R. 15)

• A December 13, 2005 MRI of Plaintiff's cervical spine showed no disk herniation, stenosis, or neural foraminal narrowing at the CT-3 location, "minimal disk bulge" without stenosis, at the C3-4 and C4-5 locations, and "mild to moderate broad based posterial disk bulge" at the C5-6 location.  That MRI study by Radiologist Edward Giaroli, M.D., concluded there was "disk bulge associated with a mild disk protrusion acentric to the left resulting in mild spinal canal stenosis and mild left neural foraminal narrowing."  (A.R. 317-18, emphasis added.)

• On December 2, 2005, Dr. Crump concluded that Plaintiff was able to work four hours a day. (A.R. 305) But two weeks later Plaintiff's complaints were so severe and emotional that Dr. Crump concluded that "Patient mental and health condition warrants indefinite medical leave from work." This conclusion was apparently reached because of Plaintiff's complaints of severe headaches, neck pain, lack of sleep, burning sensation under her skin, etc.  (A.R. 311) At that point, Dr. Crump informed Plaintiff's employer that Plaintiff could not work. (A.R. 310, December 16, 2005)

• In a follow-up office visit with Dr. Bobo on December 19, 2005, Plaintiff's subjective complaints shifted from her lower back to her neck and shoulder.  She identified "sitting" as an "aggravating factor."  (A.R. 349) Dr. Bobo concluded that "her neck needs to be treated with medications and time," and "encouraged exercise," but significantly imposed "no work restrictions from lumbar or neck pain."  (A.R. 352) By that date, of course, plaintiff had quit working.

This pattern of extreme complaints of pain, against a backdrop of mild objective findings, required Lincoln to carefully evaluate and study Plaintiff's claims.  As shown below, Lincoln's

---

[5]It is noteworthy that, during that initial office visit, Dr. Crump assessed Plaintiff with not only an "acute injury to sciatic nerve," but also "exacerbation" of arthritis and fibromyalgia.

evaluation, both initially and during two administrative appeals, was thorough, fair and proper.

## VI. The Administrative Record Reflects Full and Fair Reviews and Decisions of Plaintiff's Claim

The Administrative Record reflects a meticulous review and analysis of Plaintiff's claim. The record begins with Lincoln's "LTD CLAIM PROFILE." (A.R. 1-5) That Profile reflects, in reverse chronological order, the significant actions undertaken by Lincoln in reviewing and deciding the claim beginning on January 9, 2006. A "Chronological Activity List" (A.R. 6-9) contains abbreviated descriptions of over 100 communications between Lincoln, Plaintiff, her employer, and her physicians. Numerous telephone calls are documented and summarized in the record (A.R. 17-21). The record also reflects internal communications and analysis by Lincoln's personnel. (A.R. 22-28)

### A. The Initial Claim Review and Decision

Lincoln began reviewing Plaintiff's claim on January 10, 2006. Initially the claim was incomplete, due to the absence of the employer's submission which Lincoln sought and obtained on January 12, 2006. (A.R. 16)

Based on a telephone interview with Plaintiff, Lincoln's case manager initially believed "approval is likely." (A.R. 16, January 12, 2006 entry) However, after reviewing medical records and various consultations among claims personnel, Lincoln believed that Plaintiff was not totally disabled from her own occupation, based on typical recovery periods for sciatic nerve injuries, absence of surgery, mildness of Plaintiff's lumbar disk bulge, absence of nerve compromise, and Plaintiff's conservative treatment. (A.R. 15, January 16, 2006 entry.)

19

When Plaintiff was informed by telephone of Lincoln's impression of her claim, she asserted various medical reasons that she could not return to work: "(1) fibromyalgia, (2) sleep apnea, (3) cervical and lumbar pains, (4) depression."  Plaintiff informed Lincoln that she was seeing other doctors, whose records had not been provided.  Lincoln informed  Plaintiff that it had only considered the lumbar problems that were presented as the subject of her claim, and agreed to review additional documentation to be submitted by Plaintiff.  For the rest of January,  Plaintiff repeatedly called and contacted Lincoln about her claim.  Lincoln invited  Plaintiff to submit additional medical records, which she did.  In fact, Lincoln sent a letter to  Plaintiff on January 19, 2006, quoting the pertinent policy definition of "Totally Disabled" and explaining the information needed to support her claim.  In that letter, Lincoln documented a phone conversation of the same date in which Plaintiff said she would provide additional medical information.  (A.R. 241-42)

Plaintiff sent additional records to Lincoln, focusing now on neck pain rather than lumbar pain.  (See e.g., A.R. 234-39) The newly-submitted medical records included records from Bruce Porter, M.D., indicating an "overall" impression of 1) myofascial pain/current/historic/fibromyalgia; 2) chronic pain syndrome, with sleep disturbance and mood disturbance; 3) primary mood disorder /historic/exacerbated by current situation; and 4) "consider primary thoracic spine area concerns..." (A.R. 229)

Lincoln requested and received records from neurosurgeon W. Craig Clark, M.D.  Those records indicated that, while Plaintiff had a bulged cervical disk at the C5-6 location, she was "in no apparent distress" upon physical examination, her "neck is full and supple," and "there is a full ROM [range of motion] of the cervical spine in all quadrants of motion including flexion, extension, and lateral rotation in either direction."  (A.R. 215, emphasis added.) Doctor Clark also noted that, according to  Plaintiff's self-reported history:

20

"She was having so much trouble with her back and left lower extremity, she wasn't paying much attention to her neck. She then tried to return to work as a registered nurse with United Blood Services. This required sitting at a computer for long periods. With this she started noting severe pain 'all the way through' her chest and intrascapular region. These pains were so severe they would 'eat her up'."

(A.R. 214)

Obviously, Plaintiff's medical records indicated that her complaints and symptoms were inconsistent. The objective studies by physicians did not appear to support Plaintiff's own conclusions about her ability to work. Dr. Crump's conclusion that "patient's mental and health condition warrants indefinite medical leave from work" in mid-December (A.R. 311) is not supported by other healthcare providers - - particularly in light of Dr. Crump's own conclusion that Plaintiff had "improved significantly and hopefully will return to work" in October (A.R. 303).

To help resolve these inconsistences, Lincoln's long-term disability specialist, Dana Roberts (identified as "DYR" in some record entries) consulted with Toni Janecek, R.N. Ms. Janecek reviewed the available records and concluded as follows:

01/26/06-DYR. This is a 46 yr old F with DOD of 09/23/05 for back and neck pain. This is an initial claim with a 90-day elimination period. There is an APS in the file from Dr. Crump, dated 12/23/05. He writes that the claimant is not able to sit, stand or walk. He writes to avoid further deterioration in health, pt has been advised to stop working indefinitely. I do not feel the medical in the file supports these restrictions. The claimant has had testing completed. This includes a cervical MRI completed on 12/13/05. This shows disc bulge at C5-6 associated with small disc protrusion eccentric to the left resulting in mild spinal canal stenosis and left neural foraminal narrowing. There was an MRI of the lumbar spine completed on 10/5/05 that did not show any nerve impingement. There was some mild bulges noted with mild canal compromise. The EMG in this file, I believe this was dated on 11/1/05. This showed prolonged left peroneal f-wave, which may indicate spinal nerve root entrapment (mild). I do not feel that this finding would restrict the claimant from functioning at a sedentary to light work level. She has been treated conservatively and there is no mention of any need for surgery. In fact the notes dated 12/19/05 from Dr. Bobo - neurosurgical states

21

that the MRI shows C5-6 disc herniation with plenty of room for the spinal cord. He writes that she would not benefit from any surgery. He also talks about the MRI of the left shoulder and that she has some bursitis and tendonitis when reviewing her physical exam from this date, it does not appear that she has any neural compromise. No clubbing, cyanosis, or edema present. She had good heel-toe walk. She had good strength, no atrophy or fasiculations. <u>In summary, Dr. Crump writes on the APS that the claimant is not able to do anything at all and will never be able to. These limitations appear extensive and the medical does not support this</u>. Please let me know if you have any questions. Thank you, Toni.

(A.R. 196, emphasis added.)

Clearly, this registered nurse concluded, with ample record references, that the medical evidence did not support Plaintiff's claim that she could not work. However, Lincoln's Benefit Specialist, Jack Fu (identified as "JAF" in the Administrative Record), noted that additional medical records were received after Ms. Janacek issued her conclusion. Mr. Fu submitted the additional information to Ms. Janacek and asked for another review, stating "I would like the [employee] to have a fair review of all her info. Hence, would you mind reviewing the notes from Dr. Clark? Does new information support [restrictions and limitations] that would preclude employee from a sedentary occupation? Thanks again." (A.R. 196).

As requested, Ms. Janacek reviewed the additional medical information. Her analysis was clear, and obviously based on a close review of the records. Ms. Janacek noted that on physical examination, Plaintiff had a full range of motion in her cervical spine "with pain noted;" Ms. Janacek also noted that Plaintiff had "pain with her lumbar range of motion." Since Ms. Janacek, a nurse, was not fully appraised of Plaintiff's job duties, she suggested "we may want to clarify her job," since "she may have some limitations from overhead lifting or repetitive overhead work." <u>But again, she concluded that the medical records did not support the restrictions and limitations imposed by Dr. Crump</u>. (A.R. 196 - 02/07/06 entry)

## B. **Lincoln's Initial Claim Decision**

Based on this thorough review of medical information, and after Plaintiff had a full opportunity to submit information, Lincoln issued its decision of Plaintiff's claim. In a letter dated February 8, 2006, Mr. Fu informed Plaintiff that her claim had been denied. His letter spelled out the grounds for Lincoln's decision in detail, with specific references to the policy's terms, her employer's description of Plaintiff's job duties, and the medical records. The claims decision concluded as follows:

> We sympathize for your complaints for continued back and neck pains. However, the information we have obtained does not support your inability to perform at a sedentary occupational capacity. The restrictions indicated by Dr. Crump are not supported by the medical information obtained nor are you required by your employer to sit and/or stand for prolonged periods of time.
>
> After a thorough review of the information received, we have determined that you do not meet the definition of Total Disability as defined above.

(Decision Letter, February 7, 2006, A.R. 194)

The letter informed Plaintiff of a right to appeal the decision and invited her to provide any documentation in support of her appeal.

## C. **Plaintiff's First Appeal**

In March, 2006, Plaintiff submitted her appeal. Plaintiff set forth her own arguments in an effort to rebut Lincoln's conclusions. (See A.R. 173) Plaintiff also apparently sought help from her physicians in advocating her claim, as their records increasingly referenced her ability to work. (See, e.g. A.R. 183-83, Dr. Porter's notes of 2/13/2006 stating "disability denied," and "unable to sit for prolonged periods (greater than 5 minutes)," and "needs to, wants to work/unable to at this time,"

23

all reflecting Plaintiff's self-reported history.)  Dr. Crump provided  Plaintiff with narrative notes, stating in April that "due to Mrs. Roberts chronic FMS [Fibromyalgia Syndrome] in conjunction with other medical complications, she is not able to do work-related activities;" Dr. Crump noted Plaintiff's diagnosis as "Major Depression," and stated "I am requesting that Mrs. Roberts be granted Disability based on documented medical facts and finding." (A.R. 169-70, emphasis added.) Despite Dr. Crump's assessment that  Plaintiff suffered from "Major Depression,"  Plaintiff repeatedly rejected his referrals to psychological counseling.  (A.R. 158)

Plaintiff's appeal was reviewed by LeAnn Rice, Disability Appeals Specialist, and others. The Administrative Record reveals numerous communications between Lincoln and  Plaintiff, and Lincoln's requests, receipt and review of numerous additional medical records.  (See A.R. 7-8, 11-12, 19-20)

### D.  Lincoln's First Appeal Decision

After a thorough review, Lincoln concluded that  Plaintiff's medical conditions were mild to moderate and did not disable  Plaintiff from her own occupation.  While recognizing that "the medical documentation does show that you would most likely be limited in overhead work and heavy lifting," Lincoln further noted "you are receiving conservative treatment." (A.R. 151) In a June 15, 2006 letter denying  Plaintiff's first appeal, Lincoln concluded that "the medical documentation does not support a condition that would render you unable to perform your occupation and does not support a Total Disability."  Again, Lincoln informed  Plaintiff of her right to pursue yet another appeal.  (A.R. 151)

24

### E.  Plaintiff's Second Appeal

On July 11, 2006  Plaintiff appealed.  Her appeal letter challenged Lincoln's analysis, and made an emotional, provocative argument invoking religion.  (A.R. 143)

On July 25, 2006 Lincoln acknowledged receipt of  Plaintiff's appeal.  (A.R. 140) Lincoln pointed out that the most recent medical records in the file were from April 2006, and that no additional medical evidence had been submitted with the second appeal.  Lincoln encouraged Plaintiff to submit additional information, and even suggested that additional mental health records might be of assistance in supporting her claim:

> In an effort to provide your claim with a full and fair review, it may be in your best interest to submit additional medical records beyond April 26, 2006, (in addition to what was previously submitted) for our review of your appeal.  In the April 5, 2006, office notes from Dr. Crump, I indicated that you were referred for treatment of depression. If you have been seen by a mental health professional, it may be in your best interest to send those treatment notes as any other medical documentation not previously submitted.   For specific details regarding the basis of our determination and the information previously reviewed, please refer to our letters dated February 8, 2006 and June 15, 2006.
>
> • • •
>
> It is important that we have all available medical records so that we have a clear picture of current condition.

(A.R. 140)

In support of her second appeal,  Plaintiff submitted notes from five office visits with Dr. Crump dated from May 17 to July 31, 2006 (A.R. 132-39) but nothing new from prior records. Plaintiff complained of pain "to her neck, shoulder, legs, low back and hip joints" (A.R. 134); "chronic pain to entire body" (A.R. 135); and "generalized muscular pain and headaches" (A.R. 137).  At her last session with Dr. Crump,  Plaintiff was "complaining of generalized muscular pain and headache.  Just hurts all over with sitting, walking, and lying down."  Dr. Crump reported that

"patient states she is mentally stressed and her 'fibromyalgia is on a war path again" (A.R. 137). Dr. Crump variously assessed Plaintiff with "exacerbation of generalized pain," "exacerbation of Fibromyalgia," "major depression, etc." Dr. Crump noted that Plaintiff's depression was aggravated by her mother's cancer, and resulting death in July, 2006. (A.R. 135-137)

Plaintiff also submitted additional records of her mental health counseling sessions, conducted in May through September or 2006. (A.R. 120-22, 111-13) Those sessions addressed her complaints of pain, her recent losses of her mother and a cousin, and frustration over her "fight for disability claim." (A.R. 112-13) The record did not support any claimed disability in 2005.

Plaintiff's second appeal was managed by Lincoln's Bobbi Bierwith, a highly qualified and credentialed insurance professional. Ms. Bierwith evaluated the entire file, including the newly-submitted information. She also sent the medical records to Dr. Earnest Chiodo, a physician board certified in internal medicine, preventive and occupational medicine and industrial hygiene. (A.R. 125, 128) Dr. Chiodo reviewed all medical information in the file, explained his key findings, and prepared a written report with the final conclusions:

> In conclusion, <u>medical documentation does not support a condition of severity which would render the Claimant unable to perform in her occupation</u>. Diagnostic testing and physical examination have not revealed any significant abnormalities. <u>Medical documentation does not support restrictions and limitations which would prevent her from performing the main duties of her own occupation</u> from 12/22/05 to the present. However, given the MRI findings of the cervical spine, she should not engage in frequent overhead lifting or frequent twisting of the neck.

(A.R. 127-28, emphasis added.)

Lincoln sent Dr. Chiodo's report to Plaintiff's primary care physician, Dr. Crump, and invited him to provide comments. (A.R. 122) It appears Dr. Crump did not reply to Dr. Chiodo's assessment.

In addition to having Dr. Chiodo evaluate Plaintiff's records, Lincoln also obtained a review of Plaintiff's mental health records from Paige Lewis, a Licensed Clinical Social Worker. (A.R. 105, 110) On September 11, 2006, Lincoln's Bobbi Bierwith posed the following question to Ms. Lewis:

> 9/11/06 - Claimant is a 46 yr old female HR generalist (sedentary occ), dx with sciatic nerve injury, tx pain mgment, pt and meds. Date of disability is 9/23/05. Benefit commencement date is 12/22/05. No benefits have been paid. Claimant has provided records from North Mississippi Behavioral Health Center she is requesting that we review. The file has already been reviewed for her physical conditions, please review the file and provide your opinion if the medical records support symptoms and treatment of a psychological condition that would prevent function in her own occupation. Does the medical evidence provided document restrictions and limitations that would prevent her from performing the main duties of her own occupation beyond 12/22/05 due to depression/anxiety? Currently? - BXB

(A.R. 110)

Additional records were obtained from Plaintiff's mental health counselor and were provided to Ms. Lewis for review on October 5, 2006. Ms. Lewis provided a detailed summary of those records and concluded that "Because of [Plaintiff's] losses, it is appropriate she is seeking counseling, but symptoms are not documented in significant intensity, duration, or frequency to support [restrictions and limitations] based on psychiatric illness that would prevent [Plaintiff] from performing the essential functions of her occupation." (A.R. 110, 10/11/06 entry)

## F. Lincoln's Final Decision Of Plaintiff's Claim

Based on the entire claim record, including Ms. Bierwith's analysis of the file, Dr. Chiodo's medical opinion, and Ms. Lewis's analysis of Plaintiff's mental health records, Lincoln concluded that long-term disability benefits were not owed to Plaintiff. Lincoln's

decision, and the grounds for that decision, were set forth in a detailed letter dated October 24, 2006. (A.R. 104-06) In that letter, Lincoln made the following ultimate fact conclusions, which are directly supported in the Administrative Record as set forth in the table below:

| Lincoln's Fact Conclusions - Verbatim From Final Decision Letter (A.R. 104-06) | A.R. Support |
|---|---|
| To be eligible for benefits under the policy issued to your employer, an individual must satisfy all of the provisions of the policy. This includes, but is not limited to, the following:<br>   **"Total Disability" or "Totally Disabled"** will be defined as follows:<br>   1.   During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.<br>   2.   After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any Gainful Occupation. | A.R. 52 |
| According to the information in your file, you stopped working as a Human Resources Generalist on September 23, 2005, due to back pain, neck pain, depression, and fatigue. | A.R. 344, 397 |
| Your occupation as a Human Resources Generalist is defined by the Department of Labor as being a sedentary functional demand occupation. The Department of Labor defines level of work activity as follows:<br>The Definition of sedentary work is:<br>   •   Sitting for six hours out of an eight-hour day<br>   •   Lifting no more than 10 lbs, occasionally (0-20) times a day)<br>   •   Possible frequent lifting or small objects weighing less than 10 lbs.<br> The main duties of your occupation would be as follows:<br>   •   Compiling and maintaining personal records<br>   •   Processing employment applications and assisting in other employment activities<br>   •   Updating employee files to document personnel actions and providing information for payroll and other uses<br>   •   Examining employee files to answer inquiries and providing information to authorized persons<br>   •   Compiling data from personnel records and preparing reports using computer | A.R. 129, 130, 274 |

28

| | |
|---|---|
| An MRI of your lumbar spine was performed on October 5, 2002, that revealed a mild broad disc bulge at L3-L4, moderate broad base bulge at L4-L5, and minor broad based bulge at L5-S1. However, no evidence of significant canal or neural foraminal compromise was indicated. | A.R. 203-04 |
| An MRI of your cervical spine was performed on December 13, 2005, that revealed a disc bulge at C5-C6 with a small disc protrusion that indicated mild spinal canal stenosis and mild left neural foraminal narrowing. | A.R. 318 |
| Dr. Bobo, at North Mississippi Neurosurgical Services, saw you on December 19, 2005, for complaints of neck and left shoulder pain since December 6, 2005. He reviewed your x-ray and MRI reports. He noted that he felt your left shoulder pain was due to bursitis and tendonitis. He noted that no myelopathy or radiculopathy was indicated, and he did not feel that you were a surgical candidate. He encouraged you to exercise and stated that you had "no work restrictions from lumbar or neck pain." | A.R. 349-52 |
| You saw Dr. Clark on January 29, 2006. He noted: "There is full ROM (range of motion) of the cervical spine in all quadrants of motion including flexion, extension, and lateral rotation in either direction. | A.R. 215 |
| All medical evidence in your file was referred for review by an independent physician, Earnest P. Chiodo, M.D., Diplomate of the American Board of Internal Medicine, Diplomate of the American Board of Preventative Medicine in Occupational Medicine, Diplomate of the American Board of Preventive Medicine, Diplomate of the American Board of Preventitive Medicine in Public Health and General Preventive Medicine, and Diplomate of the American board of Industrial Hygiene as a Certified Industrial Hygienist. He was asked to review your medical information and comment on your physical conditions. His impression was noted as follows:<br><br>     In conclusion, the medical documentation does not support a condition of severity which would render the Claimant unable to perform in her occupation. Diagnostic testing and physical examination have not revealed and significant abnormalities. Medical documentation does not support restrictions and limitations that would prevent her from performing the main duties of her own occupation from 12/22/05 to the present. However, given the MRI findings of the cervical spine, she should not engage in frequent overhead lifting or frequent twisting of the neck. | A.R. 127-28 |

| | |
|---|---|
| Your medical records were also referred to a licensed mental health professional, Page Lewis, LCSW, for review and comment regarding your complaints of depression and anxiety. After review, her impression was noted as follows:<br><br>    Claimant is still receiving conservative treatment with infrequent session and no documentation regarding current psychotropic medications. Content of sessions focuses on claimant's physical pain and family health worries. Because of claimant's losses it is appropriate she is seeking counseling but symptoms are not documented in significant intensity, duration, or frequency to support restrictions and limitations based on psychiatric illness that would prevent claimant from performing the essential functions of her occupation. | A.R. 110 |

Based on this documented evidence in the Administrative record, Lincoln

concluded as follows:

> Ms. Roberts, we acknowledge you have been assessed with back pain, neck pain, depression, and fatigue. The medical records support restrictions and limitations of no frequent overhead lifting or frequent twisting of the neck. However, these restrictions would not prevent you from performing the main duties of your occupation as a Human Resources Generalist. Your mental health treatment is conservative with medications and infrequent therapy sessions, and the records do not support restrictions and limitations due to your psychological complaints. In summary, the medical documentation does not support a condition that would render you unable to perform your occupation and does not support a total disability. As a result, we are unable to overturn our previous determination, and your request for benefits has been denied.

(A.R. 106)

Clearly, these are discretionary fact decisions and ultimate policy interpretations. Lincoln's conclusions were well supported by the evidence in the administrative record. Through three reviews, by different personnel, Lincoln was steadfast and attentive in considering all pertinent evidence.

### VII.  Conclusion

Under controlling Fifth Circuit authorities, this Court is to confirm Lincoln's claim decision if "substantial evidence" supports that decision.  As defined by this Court and the Fifth Circuit, "substantial evidence" is enough evidence that a reasonable mind might find acceptable to support the decision.   The Administrative Record, as partially described above, demonstrates that substantial evidence indeed supported Lincoln's findings.  Plaintiff cannot seriously contend that the Administrative Record lacks such evidence.  Therefore, Lincoln is entitled to summary judgment, dismissing  Plaintiff's claim with prejudice.

RESPECTFULLY SUBMITTED:

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY

  /s/ William F. Ray
By:  William F. Ray (#4654)

WATKINS & EAGER, PLLC
400 East Capitol Street
300 Emporium Building
P. O. Box 650
Jackson, MS 39205
Phone:  (601) 948-6470
Fax:     (601) 354-3623

## <u>CERTIFICATE OF SERVICE</u>

     I, William F. Ray, hereby certify that I have this day electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which sent notification of such filing to the following: Carter Dobbs, Jr. and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants: (N/A).

     This the __17th__ day of December, 2008.

                                   _/s/ William F. Ray_____
                                   William F. Ray